THE STATE OF OHIO, APPELLEE, *v.* BREWER, APPELLANT.

[Cite as State *v.* Brewer (1990), 48 Ohio St. 3d 50.]

(No. 88-1852 — Submitted October 24, 1989 — Decided January 10, 1990.)

*William F. Schenck,* prosecuting attorney, for appellee.

*Randall M. Dana,* public defender, *Joann Bour-Stokes* and *Richard J. Vickers,* for appellant.

H. BROWN, J. R.C. 2929.05(A) requires us to undertake a three-stage review in capital cases. First, we must review the judgment and consider the claims of error as in all criminal cases. Second, we must independently weigh the evidence of aggravating and mitigating factors. Finally, we must decide whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. For the reasons set forth below, we affirm the conviction and uphold the sentence of death.

## I

*Admission of Victim Impact Statement*

In his first proposition, appellant

contends that the trial court improperly considered Joe Byrne's letter in its sentencing decision, in violation of *Booth* v. *Maryland* (1987), 482 U.S. 496.[1]

We have previously considered this issue in *State* v. *Post* (1987), 32 Ohio St. 3d 380, 513 N.E. 2d 754, certiorari denied (1988), 484 U.S. 1079, 98 L. Ed. 2d 1023, 108 S. Ct. 1061. *Booth* concerned the admission of a victim impact statement in the sentencing proceedings of a capital jury trial. The *Booth* court held that the introduction of "emotionally charged" statements by the victim's next of kin "* * * can serve no other purpose than to inflame the *jury* and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. * * *" (Emphasis added.) *Id.* at 508. In *Post,* as in the case *sub judice,* the defendant was tried by a three-judge panel rather than a jury. Indulging in "* * * the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment," *State* v. *White* (1968), 15 Ohio St. 2d 146, 151, 44 O.O. 2d 132, 136, 239 N.E. 2d 65, 70, we held

that "[a]bsent an indication that the panel was influenced by or considered the victim impact evidence in arriving at its sentencing decision, the admission of the victim impact statement * * * did not constitute prejudicial error." *Post, supra,* at 384, 513 N.E. 2d at 759; see, also, *State* v. *Sowell* (1988), 39 Ohio St. 3d 322, 328, 530 N.E. 2d 1294, 1302, certiorari denied (1989), 490 U.S. ____, 104 L. Ed. 2d 200, 109 S. Ct. 1766. Appellant asserts that *Booth* makes no distinction between jury trials and bench trials, and thus our holding in *Post* should be overruled and the sentence of death vacated.

We do not agree. In *Booth,* the court expressed concerns that the presentation of victim impact evidence might "* * * distract the sentencing jury from its constitutionally required task [of] * * * determining whether the death penalty is appropriate * * *," *Booth, supra,* at 507, or "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.* at 508. There is no mention of bench trials. If the United States Supreme Court intended *Booth* to apply to bench trials, it would have said so.[2]

---

[1] Appellant did not object to the admission of the letter at trial. The prosecutor urges us to consider the error waived. Because this is an important issue in a capital case, we decline to do so and address it on the merits.

[2] The United States Supreme Court denied certiorari in *Post* and at least two other cases which held that the admission of victim impact evidence in a bench trial, or in a jury trial where only the judge has knowledge of and access to this evidence, did not constitute reversible error. *Lightbourne* v. *Dugger* (C.A. 11, 1987), 829 F. 2d 1012, certiorari denied (1988), 488 U.S. ____, 102 L. Ed. 2d 346, 109 S. Ct. 329; *State* v. *Sowell* (1988), 39 Ohio St. 3d 322, 530 N.E. 2d 1294, certiorari denied

(1989), 490 U.S. ____, 104 L. Ed. 2d 200, 109 S. Ct. 1766. While a denial of certiorari is not a judgment on the merits, Wright, Law of Federal Courts (4 Ed. 1983) 757, Section 108, the fact that the court has repeatedly declined the opportunity to apply *Booth* to bench trials suggests that this application might never have been intended.

We also note, though it is not critical to our decision, that appellant himself first raised the issue of Joe Byrne's feelings toward appellant in the *guilt* phase of the trial. During the cross-examination of Joe, the following exchange took place:

"[MR. DAVIS (defense counsel)]. You at this period of time have indicated that you hate Dave Brewer, is that correct?

"A. Yes, sir."

Appellant also contends that, even under the test enunciated in *Post,* he was prejudiced by the introduction of Joe's letter. We find no mention of the victim impact evidence in the trial court's opinion, nor any indication that the three-judge panel relied on it in arriving at the sentence of death. Accordingly, we reject appellant's first proposition of law.

### Evidence of Forcible Sexual Acts

At trial, the prosecution introduced testimony from a police officer that appellant told them Sherry may not have been a willing sexual partner. The deputy coroner testified that Sherry's body exhibited bruises which may have been caused by forcible thrusting of a man's body on top of her. Appellant argues in his twelfth proposition of law that this was "evidence of another crime, rape, for which appellant was not indicted," and that its introduction constituted a violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Appellant advances a related claim in his fifth proposition, where he argues that the prosecutor injected rape as an unspecified aggravating circumstance into his cross-examination of Dr. Schramm. Our review of the transcript indicates that the cross-examination was directed at the factual basis for Dr. Schramm's diagnosis, not at proving an unspecified charge of rape.

We find no indication that the trial court considered rape as an additional crime or as an aggravating circumstance. Moreover, no effort was made by the prosecution to demonstrate appellant's bad character in violation of Evid. R. 404(B). The evidence in question was used by the prosecution to explain and refute the various versions offered by the appellant with regard to the specific crime for which he was charged.

Accordingly, we reject appellant's fifth and twelfth propositions of law.

### Weighing of Aggravating and Mitigating Factors

In his tenth proposition of law, appellant attacks the process of weighing aggravating and mitigating factors used by the courts below. He contends that the court of appeals failed to give proper weight to appellant's lack of criminal history, good work record, and concern for the members of his family. He also claims that the court below improperly failed to consider his claim of mental illness, expressions of remorse, and potential for rehabilitation.

The United States Supreme Court consistently stresses the need for " '* * * individualized consideration of mitigating factors * * *.' " *Eddings* v. *Oklahoma* (1982), 455 U.S. 104, 105, quoting *Lockett* v. *Ohio* (1978), 434 U.S. 586, 606. The court has expressly refused to dictate what weight or importance to assign to particular mitigating factors. *Id.* at 114-115, 117. The focus has always been "on the circumstances of the crime and the character of the individual defendant * * *." *Proffitt* v. *Florida* (1976), 428 U.S. 242, 251. See, also, *Booth, supra,* at 502; *Zant* v. *Stephens* (1983), 462 U.S. 862, 879.

Our review satisfies us that these mandates were met. The court of appeals' opinion indicates that the court assigned no weight to Dr. Schramm's diagnosis because it concluded that his testimony failed to establish the existence of a mental defect which impaired appellant's ability to conform his conduct to law. Nothing in the Ohio statutes or the decisional law mandates that a court give weight to a mitigating factor which it finds is not present.

The court's refusal to consider appellant a "youthful offender" was also proper. Appellant was twenty-five years old, has attended college and, prior to this crime, was a successful member of the adult work force. Nothing suggests a lack of the maturity one would reasonably expect of an adult.

Accordingly, we find no error in the weighing process used by the court of appeals. Pursuant to R.C. 2929.05 (A), we shall conduct an independent review of the aggravating circumstances and mitigating factors in Part II of this opinion.

### Confession Issues

In his second, third and fourth propositions of law, appellant argues that his confession and other inculpatory statements were obtained in violation of his Fourth and Fifth Amendment rights. We discuss these arguments in turn.

In his second proposition, appellant claims that his confession and subsequent inculpatory statements were fruits of an illegal search and seizure. He bases this claim on the fact that the police monitored his conversation with his wife in the interrogation room, violating their expectation of privacy and, thus, their Fourth Amendment rights.

The Supreme Court of the United States has declared that "* * * application of the Fourth Amendment depends on whether a person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action. * * *" *Smith* v. *Maryland* (1979), 442 U.S. 735, 740. Two questions are involved: the person's subjective expectation of privacy, and whether "* * * the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. * * *" *Id.* at 740. However, if one party to an otherwise private conversation consents to eavesdropping, the other may not claim Fourth Amendment protection. *United States* v. *White* (1971), 401 U.S. 745.

In the instant case, there is at least some question as to whether appellant and his wife could have a " 'reasonable' * * * '* * * expectation of privacy' " in a police interrogation room equipped with two-way mirrors. Additionally, there was testimony that Kathy was told that the conversation would be monitored.[3] In overruling the motion to suppress, the trial court impliedly found that she had been so advised. However, even if she had not, there would still be no error because the substance of the conversation between appellant and Kathy was not introduced at trial. Accordingly, we reject appellant's second proposition of law.

In his third proposition of law, appellant contends that his confession should be suppressed as the product of "deceitful" and "coercive" interrogation. Appellant claims that his lack of prior experience with police interrogation techniques, the "length and inten-

---

[3] At the suppression hearing, Detective Teague was asked:

"[MR. DAVIS]. At any time was Kathy Brewer told that there was a listening device present in the room?

"A. Yes, sir, she was.

"Q. When was that?

"A. When she consented to go in and talk to her husband * * *."

Kathy Brewer was asked:

"[MR. DAVIS]. When they asked you to go in there, you volunteered to go; did at any time they tell you the room was wired?

"A. No.

"Q. Did they at any time tell you they would be overhearing the conversation you had with your husband?

"A. No."

sity of the interrogation," and the monitoring of his conversation with Kathy combined to make his confession involuntary.

Whether a confession is voluntary depends upon "* * * the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment, and the existence of threat or inducement." *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 3 O.O. 3d 18, 358 N.E. 2d 1051, paragraph two of the syllabus, vacated as to death penalty, *Edwards* v. *Ohio* (1978), 438 U.S. 911. Applying *Edwards* to the facts of this interrogation, we find this proposition without merit.

Appellant was and is a sophisticated, college-educated adult who, throughout the interview, acted assertively. He was not taking drugs or alcohol and had no physical problems. The appellant's age, mentality, and lack of prior criminal experience were not factors in his decision to confess.

We find nothing improper in the "length, intensity, and frequency" of the questioning. There is no evidence of "physical deprivation or mistreat-ment." Though appellant was at the police station for at least seven and one-half hours before confessing, the actual interview took up only about three hours. The longest delay, from 10:47 p.m. to about 2:00 a.m., resulted from appellant's desire to talk to his wife, who was being treated for shock. The Springdale police officers conducted themselves with exemplary professionalism. Appellant was fully advised of his rights before questions were asked. The officers made frequent inquiry into appellant's comfort and took regular rest breaks.

No threats or inducements were made. When he finally did confess, after speaking with his wife, appellant did so because of conscience.[4] When the reason for a confession is the accused's inner compulsion, the confession is voluntary and admissible. *Colorado* v. *Connelly* (1986), 479 U.S. 157. Accordingly, we reject appellant's third proposition of law.

In his fourth proposition of law, appellant contends that his inculpatory statements were obtained in violation of the warning requirement of *Miranda* v. *Arizona* (1966), 384 U.S. 436. He argues that the failure of the Springdale police to re-advise him of

---

[4] At the suppression hearing, the following exchange took place:

"[PROSECUTOR SCHENCK]. Then you go ahead, David, at this point [after talking to Kathy at the station] you go ahead and begin to tell about the events and what happened. Why did you tell him [the officer], why did you go ahead at that point? You wanted to get it off your chest, did you not?

"I'm not trying to trick you, the truth is you wanted to tell it, you wanted to get it out, true?

"A. Yeah.

"Q. It was a burden that was laying very heavy on you at that point?

"A. Yes, sir.

"Q. It was consuming you, wasn't it?

"A. Yes, sir.

"Q. And it had been eating at you obviously for days, true?

"A. Yes, sir.

"Q. And you wanted to frankly relieve yourself of that burden and get it out of you, true?

"A. Yes, sir.

"Q. *It wasn't because the police officers threatened you or because they promised you anything* or because you didn't understand what was going on. It really was because you just wanted to get it out, true?

"A. Yes, sir. Maybe not that particular time, but yes." (Emphasis added.)

his rights before he gave his confession, and again before his inculpatory statements en route to the crime scene, and at the Beavercreek police station, renders those statements inadmissible.

*Miranda* "* * * 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.' " *Minnesota* v. *Murphy* (1984), 465 U.S. 420, 430, quoting *Roberts* v. *United States* (1980), 445 U.S. 552, 560. The prosecution argues that appellant's initial confession was noncustodial because appellant was not yet under arrest, and that *Miranda* does not apply. While this may be technically true, there is a strong probability that appellant reasonably believed he was not free to leave. Therefore, we assume for purposes of discussion that appellant was "in custody" within the meaning of *Miranda*.

There were conflicting accounts of the circumstances of appellant's confession. Detective Teague and Officer Koenig testified that Kathy came out

of the interrogation room and said that appellant wanted to talk to the officers.[5] Appellant, Kathy, her father and her brother claimed that she never left the room.

In overruling the motion to suppress, the trial court impliedly found that the police officers' testimony was credible. Accepting this finding, as we must on review, we find that the statement was voluntary, and there was no need for the officers to re-advise appellant of his rights.

Appellant's complaints about his second statement are also without merit. Officer Koenig, who sat with appellant on the ride to the crime scene, testified that appellant indicated awareness of his *Miranda* rights when he gave his second statement. Given appellant's willingness to talk, and his admitted knowledge of his rights, another full *Miranda* warning was not required.

Appellant gave his third statement to the Beavercreek police after the visit to the crime scene. Lieutenant Crowder of the Beavercreek police

[5] Detective Teague testified at the suppression hearing:

"[MR. SCHENCK]. Then what occurred?

"A. At 2:15 a.m., she exited the room; said 'Officer Teague, my husband wants to talk to you now.' We went back into the room. Lt. Pitman followed one or two minutes later at which time Mr. Brewer confessed to the murder of Sherry Byrne.

"* * *

"Q. Did you, when you went back in to the room at 2:15, or any other officers in your presence, question him on the basis of what you had heard said between himself and his wife?

"A. No sir, we did not.

"Q. In fact, when you got in there, you hardly questioned him at all and he opened up and started to tell you, is that not true?

"A. That is correct, sir."

Officer Koenig testified:

"[ASSISTANT PROSECUTOR FLANNERY]. When you returned to the police station that night after obtaining his car, securing his car, was he questioned further?

"A. After my return — he — upon my return, Mr. Brewer was in the interview room with his wife. Shortly after I did return, his wife came out and told us that he would like to talk with us."

The interview transcript contains the following statement by Detective Teague:

"* * *[Kathy] has talked to you. She came out of the Interview Room and indicated to me that you wanted to talk to me. When I came into the room, your first statement was to me, was that you were sorry, but that you had killed her."

Though appellant and Kathy were both present, neither of them said anything to contradict Detective Teague's narrative.

testified that appellant was not given another *Miranda* warning. Whether the original *Miranda* warning given at 6:43 p.m. the previous day was still effective is determined by reference to the totality of the circumstances. *State v. Roberts* (1987), 32 Ohio St. 3d 225, 232, 513 N.E. 2d 720, 725.[6] Applying the *Roberts* criteria to the instant case, we note that, while a great deal of time had passed, the interrogation at Beavercreek was part of a series of discussions which appellant had with the police. Appellant had, in earlier discussions, indicated his awareness of his rights. The statements he gave were simply more detailed retellings of the story which he had already voluntarily given the Springdale police. We therefore find, based on the totality of the circumstances, that no new warnings were required.

Accordingly, we reject appellant's second, third and fourth propositions of law.

### Essential Factual Findings

In his fourteenth proposition of law, appellant claims the trial court violated his Eighth Amendment rights by failing to state its "essential factual findings" on the record, as required by Crim. R. 12(E), when it overruled his motion to suppress.

We agree with appellant and the court below that this was error. However, appellant failed to object at trial, and has therefore waived the er-

ror. *State v. Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364, vacated in part, *Williams v. Ohio* (1978), 438 U.S. 911. More importantly, appellant has failed to show prejudice. The lack of factual findings has not prevented us, or the court below, from fully reviewing the suppression issues. Accordingly, we reject appellant's fourteenth proposition of law.

### Unrecorded Sidebar Conferences

In his fifteenth proposition of law, appellant argues that the failure to record several sidebar conferences warrants reversal of his conviction. Two of these occurred during the direct examination of Detective Teague. Others appear to have concerned a recess which immediately followed. Others were held at the request of defense counsel.

App. R. 9(A) requires that "[i]n all capital cases the trial proceedings shall include a written transcript of the record made during the trial by stenographic means." Crim. R. 22 further mandates recording of proceedings in all "serious offense cases." Where, as here, a different lawyer represents the accused on appeal, some courts have presumed prejudice. See, *e.g., United States v. Selva* (C.A. 5, 1977), 559 F. 2d 1303.

Appellant speculates that crucial unrecorded evidentiary rulings were made in these conferences. However,

---

[6] In *Roberts,* we adopted the criteria enunciated by the North Carolina Supreme Court:

" '* * * (1) [T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation [was] con-

ducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. * * * ' " (Citations omitted.) *Roberts, supra,* at 232, 513 N.E. 2d at 726, quoting *State v. McZorn* (1975), 288 N.C. 417, 434, 219 S.E. 2d 201, 212.

.

appellant failed to object or move for recording at trial. More significantly, appellant's present counsel failed to invoke the procedures of App. R. 9(C) or 9(E) to reconstruct what was said or to establish its importance. In the absence of an attempt to reconstruct the substance of the remarks and demonstrate prejudice, the error may be considered waived. *United States* v. *Gallo* (C.A. 6, 1985), 763 F. 2d 1504, certiorari denied (1986), 475 U.S. 1017.

Our review of the circumstances surrounding each sidebar in question, in the context of the record, reveals that none of these conferences concerned matters vital to appellate review. Accordingly, we reject appellant's fifteenth proposition of law.

Nonetheless, we caution the bench and bar against unrecorded sidebar conferences. While no prejudice occurred in the instant case, it is easy to imagine situations where the failure to record would mandate reversal. The minimal effort needed to comply with Crim. R. 22 is far outweighed by the expense, in time and taxpayer money, of retrying a complex criminal case.

### Hearsay Statements of Sherry Byrne

Joe Byrne testified at trial concerning the content of Sherry's telephone conversation with appellant. Appellant argues in his eighth proposition of law that this evidence was inadmissible hearsay.

Evid. R. 803(3) specifically provides for admission of hearsay as evidence of "* * * the declarant's then existing state of mind (* * * such as intent, plan, [or] motive * * *) * * *." See, also, *Mutual Life Ins. Co.* v. *Hillmon* (1892), 145 U.S. 285; cf. Weissenberger's Federal Evidence (1987), Section 803.15. The statement was admissible for the purpose of showing why Sherry went to appellant's motel room. Appellant all but

concedes this point in his brief, but argues that the other statements appellant made to Sherry should have been excluded.

We find no reversible error. Appellant took the stand in his own defense and confirmed the content of the conversation. Further, the three-judge panel did not use this evidence for an improper purpose. In the absence of such an indication, we presume that the court applied the law correctly. *White, supra,* at 151, 44 O.O. 2d at 136, 239 N.E. 2d at 70. Accordingly, we reject appellant's eighth proposition of law.

### Autopsy Slides

In his ninth proposition of law, appellant argues that the use of "inflammatory and gruesome slides of the victim" to illustrate the deputy coroner's testimony deprived him of a fair trial. The slides illustrated the cause of death, stabbing and strangulation. They also depicted bruising caused by "blunt injury."

Gruesome slides are not *per se* inadmissible in capital cases. *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 258, 513 N.E. 2d 267, 274, certiorari denied (1988), 484 U.S. 1047, 98 L. Ed. 2d 871, 108 S. Ct. 785; *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 265, 15 OBR 379, 401, 473 N.E. 2d 768, 791, certiorari denied (1985), 472 U.S. 1012. They may be admitted "if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Maurer, supra,* at paragraph seven of the syllabus.

Here, the slides and the deputy coroner's testimony related directly to

the issues of prior calculation and kidnapping, as well as to the nature and circumstances of the killing. Appellant claimed that no kidnapping occurred, and that he never beat Sherry. The evidence of the bruises tends to refute his contention. We therefore conclude that their probative value outweighs any possibility of prejudice.

Further, we note that appellant failed to object to individual slides as cumulative and repetitive. While a few of the slides might have been excluded as cumulative, we find nothing to indicate that the three-judge panel was inflamed by their presentation. Accordingly, we reject appellant's ninth proposition of law.

### Appointment of Assistant Prosecutor

In his seventeenth proposition of law, appellant claims that the appointment of Warren County Assistant Prosecuting Attorney James Flannery as an assistant in this case was error because Flannery had a "special interest in the case." This claim is based on the fact that Flannery served without compensation from Greene County, and that Sherry Byrne's mother-in-law was an employee of the Warren County court system. The claim is without merit.

R.C. 2941.63 authorizes the court of common pleas to appoint assistants to the prosecutor "* * * whenever it is of the opinion that the public interest requires it * * *." R.C. 309.10 provides additional authority for such appointments. See State, ex rel. Williams, v. Zaleski (1984), 12 Ohio St. 3d 109, 12 OBR 153, 465 N.E. 2d 861.

The circumstances of this case strongly support the trial court's decision. Appellant concealed, and the police recovered Sherry's body in Warren County. The kidnapping occurred in several counties, including Warren County. It is both logical and reasonable to appoint Warren County's Prosecutor to assist in the trial of a serious crime which took place, in part, within his jurisdiction.

Appellant has failed to show misconduct resulting from Flannery's alleged acquaintance with Sherry's mother-in-law. At trial, appellant's counsel indicated that he objected only to Flannery's lack of remuneration from Greene County, a practice which appears to be commonplace. Accordingly, we reject appellant's seventeenth proposition of law.

### Argument of Prosecution at Mitigation Hearing

In his seventh and sixteenth propositions of law, appellant attacks the arguments made by the prosecutor at the mitigation hearing.

Appellant's seventh proposition argues that the prosecutor improperly mentioned statutory mitigating factors not raised by the defense. Under State v. DePew (1988), 38 Ohio St. 3d 275, 284, 528 N.E. 2d 542, 553, certiorari denied (1989), 489 U.S. ___, 103 L. Ed. 2d 241, 109 S. Ct. 1099, decided after the trial of the instant case, such argument is proscribed. However, the prosecutor argued this case fairly overall, and the trial court did not, in its opinion, convert the absence of mitigation into an aggravating circumstance. No prejudicial error was committed.

Appellant's sixteenth proposition complains that the prosecutor's rebuttal argument improperly strayed from its proper scope. The scope of rebuttal argument is a matter left to the sound discretion of the three-judge panel. We find no abuse of discretion.

Accordingly, we reject appellant's seventh and sixteenth propositions of law.

### Ineffective Assistance of Counsel

In his sixth proposition of law, appellant claims numerous errors by his

trial counsel which, he asserts, deprived him of effective assistance of counsel. The standard for determining ineffective assistance of counsel was set forth by the United States Supreme Court in *Strickland* v. *Washington* (1984), 466 U.S. 668, 687:

"* * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.*" (Emphasis added.)

Appellant claims his counsel ineffectively assisted him by failing to object to duplicative convictions, failing to request recording of sidebar conferences, choosing not to make an opening statement at the mitigation hearing, not making effective use of Dr. Schramm's testimony, failing to object to introduction of the victim impact statement and certain other items of evidence, and by recounting details of the crime and expressing sympathy for the family of Sherry Byrne in his closing argument. We find appellant's claim to be without merit.

Appellant has failed to establish either prong of the *Strickland* standard. On the whole, his trial counsel functioned "as 'counsel' " in a competent manner, and presented a spirited and eloquent defense. The record does not come close to demonstrating "a breakdown in the adversary process that renders the result unreliable." Ac-

cordingly, we reject appellant's sixth proposition of law.

### Cumulative Errors

In his eleventh proposition of law, appellant claims that the errors at his trial were "pervasive" and deprived him of a fair trial. Our review, *supra,* of appellant's other propositions of law shows that there were no errors of a magnitude sufficient to warrant reversal. We likewise find that the cumulative effect of these errors does not require a reversal. We reject this proposition of law.

### Constitutionality

In his thirteenth, eighteenth and nineteenth propositions of law, appellant raises arguments concerning the constitutionality of Ohio's capital punishment scheme. These arguments have been raised and rejected by this court in previous cases. Accordingly, we reject these propositions of law on authority of *State* v. *Spisak* (1988), 36 Ohio St. 3d 80, 521 N.E. 2d 800, certiorari denied (1989), 489 U.S. ____, 103 L. Ed. 2d 822, 109 S. Ct. 1354; *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568, certiorari denied (1988), 488 U.S. ____, 102 L. Ed. 2d 261, 109 S. Ct. 272; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383, certiorari denied (1988), 485 U.S. ____, 99 L. Ed. 2d 250, 108 S. Ct. 1089; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795, certiorari denied (1986), 479 U.S. 871; and *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, certiorari denied (1985), 472 U.S. 1032.

## II

Having reviewed the judgment of the court below, we now conduct our independent weighing of the aggravating and mitigating factors contained in the record. The aggravating specification is that appellant commit-

ted an aggravated murder while also committing a kidnapping. R.C. 2929.04 (A)(7).

"Kidnapping" is defined in R.C. 2905.01:

"(A) No person, by force, threat, or deception * * * shall remove another from the place where he is found or restrain him of his liberty, for any of the following purposes:

"* * *

"(3) To terrorize, or to inflict serious physical harm on the victim * * *[.]

"* * *

"(B) No person, by force, threat, or deception * * * shall knowingly do any of the following, under circumstances which create a substantial risk of serious physical harm to the victim:

"(1) Remove another from the place where he is found;

"(2) Restrain another of his liberty * * *."

In the instant case, the appellant lured Sherry Byrne to the motel under false pretenses. He locked her in the trunk of his car and drove around for several hours. Appellant's admitted use of tape and wire "for bondage," his refusal to release her unharmed in a populated area, and Sherry's desperate attempt to signal for help with an improvised sign all indicate that she was restrained of her liberty, despite appellant's incredible claims to the contrary. The bruises on Sherry's body, which the deputy coroner concluded were inflicted while she was alive, indicate that she was terrorized and subjected to the risk of serious physical harm. Confining a person to a car trunk for hours, in itself, constitutes a risk of serious physical harm to the person confined. The aggravating circumstance is proved beyond a reasonable doubt.

Appellant introduced evidence on three of the statutory mitigating factors: mental illness, youth, and lack of prior significant criminal history.

After reviewing Dr. Schramm's testimony, particularly his cross-examination, we conclude that appellant did establish some impairment to his ability to control his behavior. We find that this factor is entitled to some, but very little, weight in mitigation.

Appellant was a college-educated, gainfully employed twenty-five-year-old adult at the time of the offense. As we discussed in Part I, *supra,* he was not a "youthful offender." We therefore find that this factor was not established.

Appellant's lack of significant criminal history is undisputed. We find that it is entitled to some weight in mitigation.

Appellant also presented evidence, pursuant to R.C. 2929.04(B)(7), of his work record, concern for family, and potential for rehabilitation. He expressed deep sorrow and remorse. We find that these factors are also entitled to some weight in mitigation.

Weighing the various mitigating factors against the aggravating circumstance, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

### III

Our final task is to determine if the sentence of death is appropriate by comparing the sentence in this case to those cases where we have previously imposed the death penalty. We have undertaken such a comparison and find that a sentence of death is neither excessive nor disproportionate.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS, WRIGHT and RESNICK, JJ., concur.